On or about April 26, 1945, while in the course and scope of his employment on a logging operation, plaintiff sustained injuries consisting of fracture of his right lower leg and a crushed ankle and heel. He filed this suit, seeking compensation at the maximum rate of $20 per week for a period not exceeding 400 weeks. He alleges that his employers were Dendinger, Inc., Livingston Sawmill Company and Theodore Dendinger. He also alleges that his weekly wage was the sum of $38.50. He made his alleged employers defendants to the suit.
In answer to the suit defendants Livingston Sawmill Company and Theodore Dendinger denied that plaintiff was their employee. In answer, Dendinger, Inc., admitted that plaintiff was its employee, that plaintiff had received injuries while in the course and scope of his employment, but denied that the nature thereof was such as to render him permanently and totally disabled. It avers that it paid plaintiff compensation up to November 17, 1945, at which time it discontinued payment of compensation for the reason that plaintiff had recovered from his injury and was physically able to return to work. It denied that the weekly wage of plaintiff was $38.50, but averred that the average weekly wage of plaintiff was $27.67, and that he was paid 65 per cent. thereof as compensation for the full term of his incapacity and further alleged that there is no further sum due him, either by way of compensation or medical expenses, it having paid all medical expense incurred in the treatment of plaintiff up to his discharge by the doctor as being physically fit to return to work. *Page 385 
Upon these issues, the case was tried. In his written reasons for judgment, the trial judge found that the plaintiff was totally and permanently disabled within the meaning of the compensation law, Act No. 20 of 1914, and was thus entitled to compensation for a period of 400 weeks. He fixed the rate of compensation at the rate of $17.98, it being 65 per cent. of $27.67, the average earnings per week of plaintiff while in the employ of defendant Dendinger, Inc. He further found that defendant had paid the sum of $273.45 as medical expenses and that plaintiff had further expended the sum of $22.70, for which he had not been reimbursed, which amount he allowed plaintiff to recover. He concludes his reasons for judgment in the following language: "* * *, there will be judgment in favor of plaintiff and against defendant, Dendinger, Inc., in the full sum of 65% of $27.67, or $17.98 for a period not to exceed 400 weeks, less compensation payments previously made to November 17, 1945, with 5% interest thereon from November 17, 1945, until paid and all costs." He then orders that there be further judgment in favor of plaintiff for the sum of $22.70; and further fixes the fees of Dr. Thames at $40 and that of Dr. McClendon as $50, as experts, as costs. The judgment as rendered and signed by him is in accordance with his reasons for judgment, except the judgment fails to recognize the weekly payments previously made by defendant to plaintiff as compensation to and including November 17, 1945. He further ordered that plaintiff's suit be dismissed as to Livingston Sawmill Company and Theodore Dendinger.
From this judgment Dendinger, Inc., has appealed. The plaintiff has answered the appeal contending that the award of compensation should be at the rate of $20 per week, and that that part of the judgment dismissing his demand against Livingston Sawmill Company and Theodore Dendinger is erroneous and should be reversed and set aside and there should be judgment in his favor and against the original defendants in solido.
[1] The first question which presents itself to us is the latter part of plaintiff's answer to the appeal. The plaintiff and the Livingston Sawmill Company and Theodore Dendinger are coappellees. It is now well established that a judgment cannot be amended by one appellee against the other appellee. If plaintiff was dissatisfied with the judgment dismissing his suit against the Livingston Sawmill Company and Theodore Dendinger, it was his duty to take an appeal. An answer to the appeal taken by Dendinger, Inc., is not sufficient. Therefore, the ruling of the trial judge absolving the defendants Livingston Sawmill Company and Leonard Dendinger from liability is not a question before us.
Since the accident and injury are conceded, the next question is the result of the injury; that is, whether plaintiff was totally and permanently injured or whether he had fully recovered on November 15, 1945, when defendant ceased the payment of compensation.
Plaintiff is an uneducated man, having gone through a part of the fourth grade, past 58 years, a man of family of five, without any capacity to perform any work except hard manual labor. As to how the accident happened, he states: "I was hooking tongs behind a caterpillar. It rools (rolls) on wheels, and I hooked the two tongs to pull them out and this pole rolled behind me and had me fastened before I knew it. Soon as I found it fastened, I flagged the cab driver and stopped him and told some men to get me loose." "Q. What injury did you receive? A. Broke my leg and run my foot out from under it. The leaders are all drawed from the strain." He further testified that immediately after the accident, he was taken to Hotel Dieu at New Orleans for treatment and remained there for a period of three weeks and three days under the care of Dr. S. Geismar, during which time the doctor set his leg, and thereafter the doctor sent him to his home. In the interim between his discharge from the hospital and November 15, 1945, he visited the doctor's office three or four times. He denies that on November 15, 1945, the last visit to Dr. Geismar, that Dr. Geismar discharged him as being able to return to work, and recommended that he return to work. He states that at that last visit the only thing the doctor recommended was that he discontinue the use of crutches, otherwise he would have a bad *Page 386 
foot. On the date of trial, he states that his foot continuously hurt him; the leaders go to sleep on him and if the foot is slightly bruised, the foot swells; he is unable to stand or bear his full weight on the foot; he is unable to do any kind of manual labor such as the dragging of tongs in the swamp on logging operations. He is unable to rest comfortably, that it pains him in his leg all the way down to his foot and that he cannot rest at night. He has to take sedatives or medicine to relieve such pains. Since his discharge by Dr. Geismar and compensation payments have ceased, he has been under treatment by Dr. Feder and has also consulted Dr. Thames and Dr. McClendon.
Dr. McClendon examined the plaintiff, the time and place of the examination not being disclosed by the record. It is shown that he X-rayed plaintiff's leg, ankle and foot, and that the X-ray showed fractures of the tibia and fibula with good alignment and good union. As to the foot, it was negative, showing no evidence of old fracture. On examination of the muscles and condition of the foot, he found the foot swollen some. After being informed as to the manner plaintiff received his injury, he was asked the question: "What is the resulting injury to the ligaments and muscles in those types of fractures and breaks?" He answered: "There is always some injury to the muscles and the ligaments are always strained and stretched." The following questions and answers are pertinent to this case:
"Q. Dr. McClendon, a person of his age, will you testify as what results inactivity of the muscles due to the recovery period in the fracture causes? A. A man of his age which is 58 has a fractured leg and you put it in a caste and it is not used or immobilized for two or three months, those muscles atrophy, get small and dry up and if they do come back it takes several months for them to come back to near normal.
"Q. Do you think, after an examination of that leg and at his age he will ever have normal use of that leg? A. No.
"Q. He was doing hard manuel labor at the time, which was logging operations which you are familiar with, and it necessitated him to pull tongs and hook them to logs for snaking out of the woods. Would you classify that as hard manual labor? A. Yes.
"Q. Is he, in your opinion, able to perform those duties at this time? A. He is not able to perform any duties whereby he would have to stay on his feet all day.
"Q. He has testified about this leg causing him pain, going to sleep on him and causing him much pain when he stood on it and put much weight on it. Are those the natural symptoms of these traumatic injuries or fractures? A. Yes.
"Q. What effect would a bruise or injury have on that leg at this time? A. That leg is not as good as it was before and the circulation is probably disturbed and a bruise or fracture of the leg now would probably be very, very hard to heal.
"Q. You testified in your opinion, he is unable to do the work as he was doing at the time of the injury. Is he able to do any hard common labor that necessitates him being on his feet? A. He is unable to do any kind of manual labor that requires him to remain on his feet any length of time."
On cross-examination, he agrees with Dr. Geismar to the effect that the fractures of the tibia and fibula had healed satisfactorily, and that it was necessary for a person receiving such an injury to use the injured limb as much and as soon as possible, otherwise he stands a chance of losing the use of it; and if he does use the injured limb, he has a much better chance of recovery, with either the partial or entire use of it. He was then asked the question: "Then you would agree with Dr. Geismar when he said he recommended his return to work?" He answered: "Except in one thing. Dr. Geismar doesn't say anything about his ankle and foot. He just mentions his knee." He further stated that the foot was swollen, caused, in his opinion, by the "impaired circulation in the middle part of the leg — the retarted circulation — the arterial and venous both." That massage, heat therapy and exercise would help, but it would take time because some of the blood vessels would have to be reproduced, especially the venous blood *Page 387 
vessels. Outside of what he found in plaintiff's foot, the plaintiff was in good shape for his age.
The evidence of Dr. J. DeLoach Thames is in the form of a letter which is dated May 21, 1946, the pertinent part of which reads as follows:
"Examination of the man's right foot and ankle reveals the skin to have a much redder appearance than that of the left and is much larger than the left. This man has ability to flex and extend his right foot about 70 percent of that of the left foot and he is unable to evert or invert the foot at all. Extending or flexing the right foot more than 70 percent by force produces marked pain in the foot. Pitting edema is present over the entire right foot, ankle and lower third of the right leg. This man seems to walk with great difficulty, unable to place much weight on his right foot.
"X-rays of the middle third of the right leg show an old fracture of the tibia and fibula which show normal callous formation and good alignment. X-rays of the right foot and ankle show no evidence of old fractures; however, there seems to be a slight downward displacement of the fibula.
"In my opinion, this man is 50 percent totally and permanently disabled in his right foot and ankle and is unable to perform the duties of a farmer."
The evidence of Dr. A.J. Feder is in the form of a statement which reads as follows:
"The above individual has been under my treatment for a markedly swollen and painful right ankle since March 4, 1946. X-Ray examination shows evidence of previous injury by a good union ossification at the middle third of the right tibia and fibula, which is claimed by above to have been suffered at the same time that the ankle was injured. Although there is no evidence of any bone injury in the ankle or foot, there is present a great deal of pain, marked swelling with distortion of the joint, and 95% limitation of motion in the joint.
"The condition of the ankle joint may be attributed to marked myosites, injuries to tendons and synovial membranes. To these may be added decreased return circulation due to lympathatic stases, not only from the ankle region but from the long-bone injury since healed.
"In my opinion, his present disability is over 95% in that he is unable to walk on his right foot, and in that his condition demands the services of expert orthopedic advice. Absolute rest for a period not less than six to seven months probably will be recommended in order for the condition to heal. Splinting during this time will be necessary.
"Even after healing there will, in my opinion, always be present about 25% disability due to the muscular spastic pains and residual rheumatic condition that persists in this type of case."
The plaintiff produced the testimony of Eddie Lee Wells and his, plaintiff's wife.
Eddie Lee Wells testified that he lived in plaintiff's community, knew plaintiff well, carried him to the ambulance on the day of his injury, sees him about once a week; that plaintiff has not done any work of any kind ever since his injury and is not able to work on account of his swollen foot and uses some kind of medicine all the time on it.
The testimony of Mrs. Hoover is to the effect that plaintiff is not and has not been able to work since the accident and injury; that he suffers a lot and doesn't rest at night or day; he uses a black salve and bathes his leg with alcohol; that he takes medicine to ease his pain at times.
The evidence of the defendant consists of the following:
The testimony of Dr. S. Geismar is in the form of a letter which reads as follows:
"I have your request for a report in the above captioned case, and in reply beg to advise you as per information already in your file Abram, who was injured on April 26th, 1945, having sustained a comminuted fracture of both bones of the right leg for which traction was applied by using a Steinmann pin introduced through the os calcis (heel bone). Traction in this instance was necessary for reason that the initial X-ray made did not reveal the proper bone alignment. After traction had *Page 388 
been maintained a second X-ray showed that the fragments of bone had been reduced to a satisfactory position.
"X-rays per se are as follows:
"4-28-45- Right leg-extensive comminuted fracture middle third of tibia with distal fragment displaced anteriorly and angulating inward.
Complete transverse fracture of the middle third of fibula with over riding inward and backwards. Displacement of the distal fragment.
"5-14-45- Previously reported comminuted fracture middle third of tibia and fibula in satisfactory position.
"This man remained in the hospital over the usual hospitalization period for a fracture. That is after the traction had fulfilled its purpose when a walking caliper was then applied. After leaving the hospital, Abram was brought to my office at regular intervals and was last seen on Nov. 15th, 1945, at which time there was no abnormalities about the right lower extremity. That is the bone alinement was satisfactory as evidenced by the x-ray findings, as well as by the physical examination.
"The knee permits complete frexion, complete extension, no abnormal lateral motions. All movements-dorsi flexion, flexion, eversion and inversion are complete.
"This man unquestionably should have returned to work after his last visit to me Nov. 15th, as this recommendation of returning to work was imparted to Abram."
A statement of the payrolls of defendant identified by the testimony of Mr. George Thayer, its bookkeeper, showing the exact amount paid to plaintiff and the exact weeks he worked for defendant was filed as follows: Total hours: 972; Total wages: $581.03; Average hours per week: 46.2; Average earnings per week: $27.67.
The defendant also produced bills showing an outlay of $273.45 for medical and hospital expenses. Plaintiff proved an additional outlay of $22.70.
[2] It is to be noted that Dr. McClendon is very positive that the plaintiff is unable, due to the injuries received by him, particularly to his ankle and foot, to do any kind of manual labor which required him to remain on his feet any length of time, such as farming and logging operations. He clearly differentiates his findings from those of Dr. Geismar. He is borne out by the evidence of Dr. Thames and Dr. Feder, supra, as to the condition of plaintiff's right foot and ankle. Dr. Thames estimates the disability as fifty per cent. total and permanent, but states that plaintiff is unable to perform the duties of a farmer. Dr. Feder estimates the disability over 95% in that plaintiff is unable to walk on his right foot. Under such evidence, we are of the opinion that the plaintiff is totally and permanently disabled within the purview of the compensation act.
[3] As to the question of the plaintiff's daily or weekly wage, we find no evidence contradictory to the statement furnished by the defendant to the effect that plaintiff's average weekly wage was $27.67, and 65% thereof is $17.98, the rate of compensation fixed by the trial judge.
[4, 5] We further find that defendant had paid compensation to plaintiff at the rate of $17.98 per week from the date of injury to November 17, 1945, the date when compensation payment ceased. In the judgment, as rendered and signed, defendant was not given this offset. We further find that the trial judge erroneously decreed that legal interest shall run from November 17, 1945.
Therefore the judgment is amended so as to read as follows:
It is ordered, adjudged and decreed that there be judgment herein in favor of the plaintiff, Abram Hoover, and against the defendant, Dendinger, Inc., fixing the compensation of plaintiff at the sum of $17.98 per week from April 26, 1945, for a period not to exceed 400 weeks, subject to a credit of compensation at like rate to November 17, 1945, with legal interest on all weekly payments past due from their respective dates they became due, until paid, and all costs, and, as thus amended, the judgment is affirmed. *Page 389